**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
LUBBOCK DIVISION**

| | | |
|---|---|---|
| **HEALTHY VISION ASSOCIATION,** | § | |
| **NATIONAL ASSOCIATION OF VISION** | § | |
| **CARE PLANS, INC., VISION SERVICE PLAN** | § | |
| **INSURANCE COMPANY, VISIONWORKS** | § | **CASE NO. _____** |
| **OF AMERICA, INC., DR. GREG HOGAN,** | § | |
| **and BOBBY MONTGOMERY,** | § | |
| | § | |
|     **Plaintiffs,** | § | |
| | § | |
| **v.** | § | |
| | § | |
| **GREG ABBOTT**, as Governor of the | § | |
| State of Texas, **ANGELA COLMENERO**, | § | |
| in her capacity as Attorney General of | § | |
| the State of Texas, **CASSIE BROWN**, | § | |
| in her capacity as the Insurance Commissioner | § | |
| of the State of Texas, | § | |
| | § | |
|     **Defendants.** | § | |

## ORIGINAL COMPLAINT

Plaintiffs Healthy Vision Association, National Association of Vision Care Plans, Inc., Vision Service Plan Insurance Company, Visionworks of America, Inc., Dr. Greg Hogan, and Bobby Montgomery file this Original Complaint as follows:

## PARTIES

1.    Plaintiff Healthy Vision Association ("HVA") is a non-profit organization incorporated in Missouri established to help its members receive benefits and resources that promote vision health and overall health and wellness, with its principal place of business located at St. Louis, Missouri. HVA has approximately 40,000 members located within the State of Texas, including over 400 in or around the Lubbock area.

2.    Plaintiff National Association of Vision Care Plans, Inc. ("NAVCP") is a non-profit corporation incorporated in Indiana with its principal place of business located in Tucker, Georgia.

3.      Plaintiff Vision Service Plan Insurance Company ("VSP") is a vision care insurance company domiciled in Ohio with its principal place of business located at 3333 Quality Drive, Rancho Cordova, California 95670 and is authorized to do business as a foreign corporation in the State of Texas.

4.      Plaintiff Visionworks of America, Inc. ("Visionworks") is a Texas corporation domiciled in Texas, with its principal place of business located in San Antonio, Texas.

5.      Plaintiff Dr. Greg Hogan is an independent optometrist who practices and resides in Lubbock, Texas.  He is in private practice subleasing premises next door to a Visionworks location and is designated as a VSP Premier Edge provider.

6.      Plaintiff Bobby Montgomery is a resident of Lubbock, Texas.  Mr. Montgomery has insurance coverage through VSP and for the past 15 years has purchased his glasses from a Visionworks store in Lubbock.

7.      Defendant Greg Abbott is the Governor of the State of Texas and is sued in his official capacity.  The Governor is a proper defendant in that capacity as he is charged under the Texas Constitution with the full and faithful execution of all state laws.  While plaintiffs will request that Defendant accept service in compliance with federal rule 4(d), Governor Abbott may be served with process at the Office of the Attorney General, 300 W. 15th Street, Austin, Texas 78701.

8.      Defendant Angela Colmenero is the acting Attorney General of the State of Texas, and is sued in her official capacity.  The acting Attorney General is a proper defendant because, among other things, she is also charged with the duty of enforcing Texas laws and defending the constitutionality of Texas statutes.  Acting Attorney General Colmenero may be served with process at the Office of the Attorney General, 300 W. 15th Street, Austin, Texas 78701.

9.      Defendant Cassie Brown is the Insurance Commissioner of the State of Texas, and is being sued in her official capacity.  The Commissioner is given the authority to enforce the provisions of Texas House Bill 1696 via administrative penalty.  As such, the Commissioner is a proper defendant with the ability to obtain penalties for violations of the challenged law. Commissioner Brown may be served with process at the Texas Department of Insurance, 1601 Congress Avenue, Austin, TX 78701.

## INTRODUCTION

10.     On June 14, 2023, Texas House Bill 1696 ("H.B. 1696") was signed into law, and will become effective on September 1, 2023.  The statute stops dead in its tracks a market-based mechanism for decreasing the cost of vision care for Texans by suppressing truthful, non-controversial speech that facilitates the provision of cost-effective care to Texans who pay for and participate in vision insurance and care.

11.     H.B. 1696 directly impacts vision care insurers and the Texas patients they insure. In sum, it restricts vision care insurers' ability to communicate the cost of vision care at competing optometrists to their insureds and prevents patients from receiving information that is important to their health care decisions.

12.     Healthy Vision Association ("HVA") is a non-profit organization established and dedicated to providing its association members benefits and resources that promote vision health, overall health and wellness, as well as advocacy opportunities so its members can have a voice on issues that may impact their lives and vision health or care.  This includes HVA providing its members access to products, services and information to which they might not otherwise have, including the opportunity for its members to enroll in affordable, high-quality vision plans from VSP, a leading provider of vision benefits.

13.     National Association of Vision Care Plans, Inc. ("NAVCP"), whose members are vision care plans, has as its mission to preserve and strengthen consumer access to affordable vision insurance and benefits which includes communicating information about quality vision care to consumers.  The members of NAVCP cover approximately 66% of all Americans by partnering with eye care providers in all 50 states and Puerto Rico.

14.     Vision Service Plan Insurance Company ("VSP") is a vision care insurer.  In addition to providing managed vision care plans, VSP owns Texas-based optometry retailer Visionworks, which maintains over 100 locations and over 1,600 employees in the state.

15.     VSP's business model provides an economic advantage to Texas eye care patients, because VSP, but for H.B. 1696, can direct insureds to the discounts and rebates offered by VSP's affiliate vision care providers.  VSP enrollees, such as association members of HVA, are thus able to receive this information and avail themselves of their most cost-effective vision care option to address their vision health needs.

16.     H.B. 1696 eviscerates this mutually beneficial model.  H.B. 1696 would prohibit vision care providers, retailers, and potentially vision care associations from communicating truthful information to consumers that would be of interest to them in seeking vision care by "identifying a participating optometrist . . . differently from another optometrist" based on discounts or incentives they offer on medical or vision care products or services, the amount or cost of any product purchased by the optometrist, or the brand of product used by the optometrist. Tex. H.B. 1696, 88th Leg., R.S. (2023), Sec. 3, § 1451.153(4).  More than that, H.B. 1696 would further prohibit vision benefit plan issuers and potentially vision care associations from communicating any distinction in optometrists to their insureds by incentivizing, recommending, or encouraging plan enrollees to obtain their vision care from any one plan-participating

optometrist over the other, or from a retail establishment owned or affiliated with the managed care plan. *Id.* § 1451.153(5). Potentially most troubling, however, is that H.B. 1696 would prevent Texas eye care patients like HVA's members and Mr. Montgomery from exercising their protected right to receive this beneficial information from vision care plan insurers and/or the health associations to which they belong.

17.    The real purpose of H.B. 1696 is obvious: insulating independent optometrists from the competition of an integrated business model, and keeping patients ignorant of financial and other benefits of pursuing lawful, alternate care providers. By keeping consumers in ignorance, H.B. 1696 will only serve to "protect" them from making the best-informed and most financially advantageous decisions regarding their vision care.

## JURISDICTION AND VENUE

18.    The Court has jurisdiction over the subject matter of this action under 28 U.S.C. § 1331 because Plaintiffs' claims arise out of Defendants' violations of Plaintiffs' rights under the First and Fourteenth Amendments of the United States Constitution. This action also is brought pursuant to 42 U.S.C. § 1983, and seeks relief for the Defendants' violations of Plaintiffs' constitutional rights guaranteed by the First and Fourteenth Amendments to the United States Constitution.

19.    Venue is proper in this judicial district because the State of Texas resides within the Northern District of Texas. *See Tex. v. Dep't of Homeland Sec.*, No. 6:23-CV-00007, 2023 WL 2457480, at *4 (S.D. Tex. Mar. 10, 2023) (accepting the State of Texas's representation that for purposes of venue "Texas resides at every point within the boundaries of this State"). All defendants are sued in their official capacity acting on behalf of the State of Texas. 28 U.S.C. § 1391(b)(1).

20.     Venue is also proper because a substantial portion of the events or omissions occurred within this judicial district, including its ongoing provision of services and associations with eye-care professionals and customers.  28 U.S.C. § 1391(b)(2).  For example, HVA's records show it has approximately 435 members who reside within or around the City of Lubbock at the time of filing this Complaint, who will be burdened by the State unconstitutionally limiting their access to truthful information and speech about vision care, insurance, and pricing.  Visionworks operates a store in Lubbock, Texas.  Dr. Hogan, whose rights are burdened by H.B. 1696, is an optometrist offering vision care services at the Visionworks store in Lubbock, Texas. Mr. Montgomery, whose right to receive truthful information about vision care is unconstitutionally restricted under H.B. 1696, is a resident of Lubbock, Texas and a longtime customer of the Lubbock Visionworks store.

## BACKGROUND

## I.    VSP's integrated vision care business model reduces vision care costs and plan premiums for VSP members.

21.     VSP is more than just a vision care plan provider.  Like other insurers, it has worked to streamline vision care from the eyewear frame factory to the optometrist's office, and reduce vision care costs in the process, ultimately benefitting its insureds.

22.     Like any insurer, VSP assesses a premium to its members in exchange for its provision of vision care benefits.  The primary driver for the cost of vision care plan premiums is the cost of vision care itself, which includes everything from vision care services like eye exams, to vision care products such as eyeglasses and contact lenses.  When these are more expensive, VSP naturally ends up paying more to cover the vision care of its insureds.  This, in turn, requires VSP to raise its premiums to accommodate costs.

23.     In light of this dynamic, VSP has sought out ways to reduce the cost of vision care,

to the benefit of both itself and its members. Noticing a cost-reduction opportunity in the vision care supply chain, VSP formed its own eyewear subsidiary called Altair Eyewear, enabling VSP to produce high quality eyeglass frames at a price it could control. VSP also has a lens manufacturing subsidiary, VSP Optics, and has since acquired another eyewear manufacturer, Marchon Eyewear, and the same cost-reduction purpose.

24.    At the other end of the supply chain, VSP's affiliate acquired vision care retailer Visionworks of America, Inc. in 2019. By owning its own supply chain from manufacturer to retailer, VSP is able to reduce costs by avoiding built-in margins at each respective stage of the supply chain. With the added benefits of economies of scale, VSP is able to facilitate cheaper vision care through its integrated business model.

25.    The result of these efforts is lower vision care costs for VSP on the insurance side of its business, thus enabling it to charge lower premiums to its members. VSP's efforts to advance the free market is a win for everyone interested in assuring maximum choices and disseminating complete and truthful information of interest to the patients who make those choices.

## II.    VSP's Premier Edge program offers VSP members discounts and rebates on vision care services and products.

26.    Like most insurers, VSP makes certain discounts and value-added benefits available to its members. One such benefit is a discount and rebate program for VSP members called "Premier Edge." VSP members can avail themselves of rebates and discounts on vision care products and services at certain vision care providers and retailers designated as "Premier Edge" locations. Providers who participate in Premier Edge agree to honor discounts and special offers that VSP advertises to its members. Both private practice and retail chain vision care locations are designated as Premier Edge.

27.    Private practice locations can achieve Premier Edge status by meeting certain

criteria. Most private practices in VSP's provider network are eligible to become a Premier Edge location. VSP designates a network private practice as a Premier Edge location when it reaches a certain purchase threshold of frames and lenses from VSP-subsidiary manufacturers. A provider must also offer advanced retinal imaging—a diagnostic tool aimed at diagnosing diseases such as glaucoma, macular degeneration, and diabetes—in at least one location to be a Premier Edge location. Providers can climb the Premier Edge ladder—there are Silver, Gold, and Platinum levels—by offering customer conveniences such as retinal imaging, free frame fittings and adjustments, and by purchasing more VSP-manufactured products.

28.     Of course, it makes sense that VSP is able to offer product discounts and rebates at provider locations only once they reach a certain threshold of VSP product purchases. That is the theory of economies of scale in action; the more VSP products a provider purchases, the lower VSP's cost-per-unit of manufacturing those products and transporting them to the retail location. Thus, with a lower cost-per-unit, VSP can afford to offer discounts and provide rebates on vision care products at those provider locations that meet the designated purchase threshold.

29.     For this same reason, all Visionworks locations are designated as Premier Edge. VSP is naturally able to offer its members discounts and rebates at the retail locations it owns due to the costs it saves in its integrated supply chain. As of May 2023, the Visionworks stores make up only 9.1% of Premier Edge locations, and private practices make up the remaining 90.9%.

30.     VSP connects its members to Premier Edge locations through the "Find a Doctor" search function on its website. While members are able to call up all in-network providers through the search, Premier Edge providers are identified with a special "Premier Edge" badge next to the provider's name in the search results. The search function enables the searcher to elect whether they would like to find a private practice Premier Edge location, a retail chain Premier Edge

location, or either one.  For some Premier Edge locations, the search results also list the brands of eyewear frames offered at that location and links to the provider's online appointment scheduling function.

31.    Users can narrow Premier Edge locations by geography, the provider network of their particular VSP care plan, the products and services offered, the brands of eyewear offered, the hours of the location, and even the gender of and language spoken by the provider.  In sum, the Premier Edge program offers consumers greater cost transparency, potentially lower vision care costs, and generally empowers consumers to make more informed decisions about their vision care.

32.    H.B. 1696 would improperly undermine the model that VSP has worked to develop by preventing VSP from sharing this truthful, helpful, and valuable information with members. H.B. 1696 improperly restrains VSP's right to convey important and cost-saving information to its members, even as it simultaneously interferes with the right of VSP's members to hear that information regarding their vision care.

### III.    HVA and Its Association Members.

32.    HVA is an association of members dedicated to being healthy and seeing well.  To that end, HVA offers education, wellness and lifestyle benefits, and scholarships.  Currently, HVA communicates information about its purpose and benefits with its members and prospective members through its website, and then specifically with its members through the online member portal, via email, and other marketing materials.

33.    For example, as part of its educational outreach efforts, HVA regularly sends a newsletter via email to its members with vision health information, eyecare suggestions, and other vision tips.  HVA also sponsors scholarships for students attending optometry school, information about which is available online.  Members receive information online about various forms of

benefits and discounts on different types of goods and services aimed at holistic health and lifestyle benefits, if they choose to use them or, as appropriate, enroll through their HVA membership.

34.      As an association dedicated to eye health and seeing well, among the important benefits communicated and offered to HVA members is an opportunity to enroll in VSP's vision care insurance.  As an association, HVA is able to offer its members the ability to purchase vision insurance at a group rate, which in most cases will enable members to obtain vision care insurance at a more affordable rate than they would be able to do as an individual market participant.  For many HVA members, this makes eye care vision insurance fiscally obtainable and by having vision insurance through VSP, HVA members are able to save on average hundreds of dollars a year on eyecare.

35.      Many, but not all, of HVA members choose to utilize the VSP vision insurance benefit and purchase insurance with VSP through their membership in HVA at the HVA group rates.  HVA members who wish to use the VSP insurance benefit separately enroll with VSP for the insurance product.  Those members rely on VSP to truthfully and fully communicate information about their vision insurance plans, in-network providers and affiliates, and benefits and discounts available to them through their VSP plan in order to fully utilize the benefits of their HVA membership and fully access the savings on eyecare to which their HVA membership entitles them.

36.      Incumbent to the ability of HVA to provide these benefits to its members is also the ability to freely receive information from VSP about VSP's products.  HVA needs to be able to evaluate the advantages of offering VSP vision insurance as a member benefit and then be able to accurately convey to its members the potential cost savings associated with the benefit so members can determine whether or not to use the VSP benefits.  To do so, HVA must be able to

freely make available or communicate that information to its members in order to help provide access to thousands of association members in need of vision care. Members often join HVA especially for the benefit of being able to associate together with other members who have vision care needs and to receive information and access to the advantages and cost savings of VSP products through their HVA membership.

37.     Under H.B. 1696, HVA and its members are (1) deprived of their ability to freely receive and/or communicate pertinent vision care information, (2) deprived of a critical function of their association through HVA in coming together to address their vision care needs, and (3) deprived of equal treatment under the law in comparison to Texas citizens suffering from other health care ailments or disabilities who are able to receive information from their insurers and associations about the lowest-cost and highest-quality providers.

38.     Similarly, without the ability to receive truthful information from VSP about the vision care plans available to HVA members and then in turn share that truthful information to its members should it elect to do so, HVA would also be unable to educate its members about the best and most affordable plans, optometrists, and discounts available.

**IV.     NAVCP and Its Association Members.**

39.     NAVCP is an association comprised of managed vision care plans who manage networks of vision providers and who are involved in contracting, marketing and administering vision care plans.

40.     NAVCP is organized for the purpose of monitoring legislation and regulations affecting the vision care industry and to improving the quality of vision care through effective credentialing and establishment of standards.

41.     NAVCP is also organized for the purpose of monitoring and disseminating

information about technologies in vision care and communicating information about quality vision care to the public and to its member organizations.

42.    NAVCP strives every day to make sure that legislators, regulators, employers and consumers understand that patient-centered vision care is essential health care.  NAVCP works to achieve that goal in part by advocating for public policies and regulations that preserve and strengthen consumer access to affordable vision insurance and benefits, by promoting the valuable role managed vision care plans play in enabling consumer access to affordable, quality vision care, by fostering patient-centered cooperation between managed vision care plans and eye care professionals and finally, by serving as a leading source of insightful and actionable vision care information.

43.    As an association dedicated to preserving and strengthening consumer access to affordable vision insurance and benefits, the association and the members of NAVCP (which includes VSP) will be deprived by the provisions of H.B. 1696 from their ability to (1) freely receive and/or communicate pertinent vision care information to its member organizations and in turn to consumers interested in purchasing vision care coverage; (2) increase the understanding about the quality of vision care through consumer education; and (3) denied the right to foster cooperative industry collaboration by communicating with its individual members.

**V.    Dr. Greg Hogan.**

44.    Plaintiff Dr. Greg Hogan is an optometrist practicing in Lubbock, Texas.  Dr. Hogan received his Doctorate of Optometry from the Ohio State University in 1984.  Dr. Hogan has been in private practice since 1984, and has been practicing in Lubbock since 1988.

45.    Dr. Hogan has accepted VSP insurance the entire time he has been in private practice.  He began subleasing an office next to the Visionworks store in Lubbock about 10 years

ago and is designated as a VSP Premier Edge provider.

46.    Dr. Hogan's status as a Premier Edge provider is displayed in the "Find a Doctor" search function on VSP's website. This badge tells VSP members that Dr. Hogan offers discounts and special offers. If VSP and Dr. Hogan are prevented by H.B. 1696 from informing VSP members of Dr. Hogan's status as a Premier Edge provider, Dr. Hogan will likely receive less business from VSP members than he otherwise would.

**VI.    Bobby Montgomery.**

47.    Bobby Montgomery is a lifelong resident of Lubbock, Texas. Mr. Montgomery has insurance coverage through VSP and has been a member for about 9 years. He has been wearing glasses for nearly 20 years and has purchased glasses from a Visionworks store in Lubbock for the past 15 years.

48.    Under H.B. 1696, Mr. Montgomery is (1) deprived of his ability to freely receive pertinent vision care information and (2) deprived of equal treatment under the law in comparison to Texas citizens suffering from other health care ailments or disabilities who are able to receive information from their insurers and associations about the lowest-cost and highest-quality providers.

**VII.    Independent optometrists turn to the Legislature, rather than the free market, to compete with VSP's superior business practices.**

49.    H.B. 1696 is a reaction to the cost-saving benefits of VSP's Premier Edge program—and other discounts and value-added benefits offered by other vision insurers. Optometrists who do not participate in these programs simply do not want to compete with the lower prices and vision care incentives Premier Edge locations afford to its members.

50.    Indeed, the advocates of H.B. 1696 were transparent about the protectionist goals of the bill. H.B. 1696 went through the House Committee on Insurance at the initial stage of the

legislative process.  As part of the public hearing process on the bill, the Insurance Committee

received 26 nearly identical written public comments in support of H.B. 1696:

> HB 1696 addresses major issues that optometry practices like mine are having with insurance companies, especially vision plans. This bill will ensure transparency and choice for patients in the eye care industry which is rapidly consolidating and vertically integrating. Vision plans are selling covered vision products, owning labs that make the glasses, and even purchasing optometry practices. The bill would ensure safeguards for fair businesses practices and would allow independent optometry practice to survive in our state. Thank you to Chairman Oliverson and the committee for considering this important bill that has a major impact on my practice and the future of eye care in Texas.

Compilation of Public Comments regarding House Bill 1696, House of Representatives

Committee      on      Insurance,      March      28,      2023,      available      at:

https://capitol.texas.gov/tlodocs/88R/publiccomments/Meetings/C3202023032808001/InputItem

s/0d9a23ef-45b3-4489-bf45-fd534b20e3ea.pdf#navpanes=0.   The House Insurance Committee

received an additional 25 comments that track the above word-for-word, or nearly so.  *See id.*

     51.    The author of H.B. 1696 also cited the same protectionist rationale for the bill when

submitting it to the committee for consideration, claiming the bill's goal was to ensure that

"independent optometry practices will continue to exist in our communities."  *88th Session

Committee Broadcast Archives*, TEXAS HOUSE OF REPRESENTATIVES, Insurance Committee

Meeting          (Mar.          28,          2023),          available          at:

https://tlchouse.granicus.com/MediaPlayer.php?view_id=78&clip_id=24230.   Through this bill,

the Legislature has isolated Texans participating in vision insurance programs, those in need of

vision correction, and those providing those services for disparate treatment in the form of speech

censorship, depriving consumers of access to helpful, truthful information about access to care and

lower cost options to obtain it.

     52.    While the bill author emphasized that "patients deserve transparency and choice,"

in reality, H.B. 1696 does the opposite.  *See id.*  It seeks to keep vision care patients ignorant of

cost-saving rebates and discounts.

**VIII.  The passage of H.B. 1696, and its effects.**

53.    On June 14, 2023, the Governor signed into law H.B. 1696, passed by the Texas Legislature, "[a]n Act relating to the relationship between managed care plans and optometrists and therapeutic optometrists," the full text of which appears in the Appendix to this Complaint. Effective September 1, 2023, the Act will amend Title 8, Subtitle F, Chapter 1451 of the Texas Insurance Code.

54.    Under the newly added statute, managed care plans (including vision benefit plans) "may not . . . identify a participating optometrist or therapeutic optometrist differently from another optometrist or therapeutic optometrist based on:

> (A) a discount or incentive offered on a medical or vision care product or service . . . that is not a covered product or service . . . by the optometrist or therapeutic optometrist;
>
> (B) the dollar amount, volume amount, or percent usage amount of any product or good purchased by the optometrist or therapeutic optometrist; or
>
> (C) the brand, source, manufacturer, or supplier of a medical or vision care product or service . . . utilized by the optometrist or therapeutic optometrist to practice optometry."
>
> Tex. H.B. 1696, 88th Leg., R.S. (2023), Sec. 3, § 1451.153(4).

55.    The law also prohibits managed care plans from "incentiviz[ing], recommend[ing], encourag[ing], persuad[ing], or attempt[ing] to persuade an enrollee to obtain covered or uncovered products or services:

> (A) at any particular participating optometrist or therapeutic optometrist instead of another participating optometrist or therapeutic optometrist;
>
> (B) at a retail establishment owned by, partially owned by, contracted with, or otherwise affiliated with the managed care plan instead of a different participating optometrist or therapeutic optometrist; or
>
> (C) at any Internet or virtual provider or retailer owned by, partially owned by, contracted with, or otherwise affiliated with the managed care plan instead of a different participating optometrist or therapeutic optometrist."

Tex. H.B. 1696, 88th Leg., R.S. (2023), Sec. 3, § 1451.153(5).

56.    "Managed Care Plan" is defined as "a plan under which a health maintenance organization, preferred provider benefit plan issuer, vision benefit plan issuer, vision benefit plan administrator, or other organization provides or arranges for health care benefits or vision benefits to plan participants and requires or encourages plan participants to use health care practitioners the plan designates." Tex. H.B. 1696, 88th Leg., R.S. (2023), Sec. 3, § 1451.151.

57.    These provisions are egregiously anti-speech; they restrict what information VSP can communicate to its members about vision care providers in the VSP network, as well as the associations who represent many of those members. The new law will consequently eviscerate the Premier Edge program by which VSP connects its members with the most cost-effective vision care.

58.    The bill vaguely prohibits vision care plans from "identifying" any optometrist "differently" from any other optometrist based on discounts or incentives offered by the provider, the provider's spending threshold on certain products, or the manufacturer of vision care products used by the optometrist. Section 1451.153(4) of H.B. 1696 is essentially a description of VSP's Premier Edge program, which designates providers as Premier Edge locations based on the criteria described by the bill. The statute may as well read "VSP shall not operate its Premier Edge program"—that would be a lot shorter, and means the same thing.

59.    Section 1451.153(5) even more explicitly restricts communication to vision care plan members. Not only may VSP not "identify" providers "differently" based on the listed criteria, but under § 1451.153(5) VSP may not incentivize patronage of any one provider over the other, and may not encourage VSP members to patronize a retailer owned by VSP (Visionworks). What that means, practically, is that VSP cannot tell its enrollees about discounts or rebates offered by any optometrist, including at its own Visionworks stores, because that may "incentivize" or

"persuade" an insured to obtain care from one optometrist over the other.  *See id.* § 1451.153(5).

60.    This law is anti-speech, anti-free market, and, frankly, un-American.

**IX.    In the same legislative session, Texas passed H.B. 711, a bill that prohibits the same censorship of insurers and health care providers that H.B. 1696 imposes upon vision insurers.**

61.    The rising costs of healthcare in the United States is a widely recognized issue. Greater cost transparency for patients, as well as increased competition among providers, is recognized to drive healthcare costs down.  There has thus been a recent push for policymakers to effectuate policies promoting both transparency and competition.

62.    In recognition of this problem, the Texas Legislature appointed a Select Committee on Health Care Reform in the 88th Legislative session.  The Select Committee on Health Care Reform was appointed with the specific aim of making healthcare more affordable for Texans through transparency and patient incentives, and generally improving the healthcare system in Texas.  *See Proclamation, Creation of Select Committee on Health Care Reform*, accessible at https://house.texas.gov/_media/pdf/committees/house-select-committee-on-health-care-reform.pdf (Feb. 8, 2023).

63.    Confoundingly, the same Legislature that passed H.B. 1696 also passed a contradictory bill, H.B. 711, which specifically prohibits private contracts containing anti-steering and anti-tiering provisions like those the state now seeks to impose upon vision service plan providers through H.B. 1696.

64.    H.B. 711 prohibits insurers and medical providers from entering into contracts that would prohibit the insurer from steering customers to certain providers based on the cost or quality of care, or for "tiering" providers in their networks by the same metric.  Tex. H.B. 711, 88th Leg., R.S. (2023), Sec. 1, § 1458.001.  The bill analysis for H.B. 711 quite properly decries these types of "anti-tiering" and "anti-steering" provisions as "anti-competitive" because they prohibit

insurers from providing price or quality information about providers to consumers; eliminating such provisions is meant to reduce the cost of healthcare through more robust provider competition. House Sel. Comm. Health Care Reform, Bill Analysis, Tex. H.B. 711, 88th Leg., R.S. (2023).

65.     But, bizarrely, these are exactly the same type of anti-competitive restrictions that H.B. 1696 seeks to impose upon vision care insurance plans, which would prevent them from informing their insureds about the lowest-cost and highest-quality providers. As the H.B. 711 bill analysis explains, the "consumer is always the victim when competition is removed." *Id.*

66.     These disparate actions from the same Legislature may be partially explained by the respective bills' different paths through committee. H.B. 1696 went through the standing Insurance Committee, while H.B. 711 went through the Select Committee on Health Care Reform. As noted, the Select Committee was aimed at reducing the cost of health care for Texans; it is telling, then, that H.B. 1696 did not go through the Select Committee on Health Care Reform. H.B. 1696 will only serve to increase vision care costs for Texans.

67.     This statutory discrepancy makes one thing clear: Texas law now treats vision plan insurers differently from other health benefit plans, and harms optometrists and optometry patients by imposing the same protectionist mechanisms from which Texas law seeks to shelter other healthcare providers.

## CAUSES OF ACTION

### Count 1:  Violation of First and Fourteenth Amendments

### (NAVCP, VSP, Visionworks, and Dr. Hogan)

68.     All other paragraphs of this Complaint are realleged and incorporated herein by reference.

69.     Plaintiffs have the right, under the First and Fourteenth Amendments of the United States Constitution, to associate and to engage in truthful commercial speech.  H.B. 1696 unreasonably restricts these rights and does so without purporting to target false or misleading speech. H.B. 1696 is not justified by any substantial state interest, does not materially advance any legitimate or substantial state interest, and is not narrowly drawn to further any substantial state interest.

70.     The First Amendment assures Members of NAVCP, VSP, Visionworks, Dr. Hogan, and others of the right to associate with other service providers and VSP with its insureds.

71.     The First Amendment, made applicable to laws passed by the State of Texas by the Fourteenth Amendment, also protects the commercial speech of businesses as a safeguard to the consumer's right to receive truthful information.  *See Allstate Ins. Co. v. Abbott*, 495 F.3d 151, 165 (5th Cir. 2007).  Indeed, a "consumer's concern for the free flow of commercial speech often may be far keener than his concern for urgent political dialogue." *Bates v. State Bar of Ariz.*, 433 U.S. 350, 364 (1977).  This is especially true "in the fields of medicine and public health, where information can save lives." *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 566 (2011).

72.     "The First Amendment requires heightened scrutiny whenever the government creates 'a regulation of speech because of disagreement with the message it conveys.'" *Id.* (quoting *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989)).  While the First Amendment may excuse incidental burdens on speech arising from restrictions on commerce, it does not permit laws that facially "impose[ ] a burden based on the content of speech and the identity of the speaker" absent the protection of a *substantial* governmental interest.  *Id.* at 567.

73.    The First Amendment assures consumer access to truthful information over the risk of the misuse of information.  The fear that more information from insurers might persuade consumers to patronize an affiliated optometry retailer is not a lawful basis for restricting the speech of vision care insurance providers such as VSP vision care plans/members of NAVCP, retail establishments such as Visionworks, or optometrists such as Dr. Hogan.  *See Sorrell*, 564 U.S. at 576.

74.    H.B. 1696 is an unconstitutional burden on speech.  It restricts vision care plan providers and others from relating non-misleading and truthful information to customers, such as which optometrists sell what vision care products, and which retailers are Premier Edge locations that may offer consumer savings.

75.    Moreover, none of the provisions restricting Plaintiffs' commercial speech are justified by any substantial state interest.  As evidenced by the bill author's comments and the H.B. 1696 committee report, the state's "interest" is protectionism at the expense of association, speech and the concomitant financial interests of the patient-consumers; H.B. 1696 protects some optometrists at the expense of other providers, and at the expense of Texas consumers.  The state's motive for passing H.B. 1696 was not protecting consumers, but rather protecting a less-competitive sector of the optometry industry.  Indeed, no consumer has been injured by receiving Plaintiffs' speech regarding discounts and rebates available at certain optometrists, including savings to be had at Visionworks.  The speech-restricting provisions of H.B. 1696 do not have the purpose or effect of eliminating or reducing consumer confusion.  The provision only serves to reduce the information available to VSP members about their vision care options.

76.    A case or controversy exists because H.B. 1696 creates a genuine, credible, real and immediate threat that Defendants—acting in their official capacities—will seek to enforce

H.B. 1696, collect civil penalties for violations of H.B. 1696, or penalize Plaintiffs for exercising their Constitutionally-protected rights.

77.    Plaintiffs seek a declaration that provisions TEX. INS. CODE. § 1451.153(4) and § 1451.153(5) are void under the First and Fourteenth Amendments of the United States Constitution.

## Count 2: Violation of the First and Fourteenth Amendments

### (HVA)

72.    All other paragraphs of this Complaint are realleged and incorporated herein by reference.

73.    HVA has the right, under the First and Fourteenth Amendments of the United States Constitution, to associate and to engage in truthful commercial speech.  H.B. 1696 unreasonably restricts these rights and does so without purporting to target false or misleading speech.  H.B. 1696 is not justified by any substantial state interest, does not materially advance any legitimate or substantial state interest, and is not narrowly drawn to further any substantial state interest.

74.    HVA incorporates and realleges paragraphs 71-75 of the Complaint.  HVA seeks to receive and convey truthful information to its members.  H.B. 1696 unconstitutionally chills HVA's ability to speak truthful information to its members and prospective members about vision care insurance generally and specifically the benefits provided by VSP's vision care insurance for members, as well as information HVA might choose to make available to its members in the future about VSP plans, including through its website and email communications.  There is no substantial state interest that justifies this burden on HVA's

ability to speak and communicate truthful health information to its members and prospective members about VSP vision insurance benefits and plan information.

75.     Not only is HVA's ability to speak to its members chilled by H.B. 1696, but HVA's First Amendment right to receive truthful information from VSP and other providers of vision insurance and benefits is also unconstitutionally burdened.  *See generally Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council*, 425 U.S. 748 (1976).  Receiving information is necessary to accurately evaluate the benefits VSP offers to HVA members and obtain information necessary to make decisions about how best to educate its members about VSP plans and benefits.

76.     A case or controversy exists because H.B. 1696 creates a genuine, credible, real and immediate threat that Defendants—acting in their official capacities—will seek to enforce H.B. 1696, collect civil penalties for violations of H.B. 1696, or penalize HVA for exercising its Constitutionally-protected rights.  H.B. 1696 injures HVA because it has a chilling effect on HVA's right to speak and receive truthful information and creates a fear of retaliatory action by the State.

77.     HVA seeks a declaration that provisions TEX. INS. CODE. § 1451.153(4) and § 1451.153(5) are void and unenforceable under the First and Fourteenth Amendments of the United States Constitution.

78.     In the alternative, HVA seeks a declaration that, under the definition in TEX. INS. CODE. § 1451.151, H.B. 1696 is not applicable to HVA as it falls outside the definition of a "managed care plan" within the meaning of the statute because it is not a plan under which a (1) health maintenance organization, (2) preferred provider benefit plan issuer, (3) vision benefit plan issuer, (4) vision benefit plan administrator, or (5) other organization provides or arranges for

health care benefits or vision benefits to plan participants and requires or encourages plan participants to use health care practitioners the plan designates.

## Count 3: Violation of the First Amendment

### (HVA on behalf of its members)

79.     All other paragraphs of this Complaint are realleged and incorporated herein by reference.

80.     HVA also brings a First and Fourteenth Amendment speech claim on behalf of its members.  Where a plaintiff is an organization, it has standing to bring claims both for an injury suffered in its own right or, alternatively, it can assert "standing solely as the representative of its members." *Warth v. Seldin*, 422 U. S. 490, 511 (1975).  Count 2, is a claim for injuries to HVA in its own right.  This count pertains to claims brought on behalf of HVA members for injuries to HVA members as a result of being unconstitutionally restrained from receiving truthful health and vision insurance information.

81.     HVA satisfies the following criteria for asserting a claim on behalf of its members: an organization must demonstrate that "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit."  *Hunt v. Washington State Apple Advertising Comm'n*, 432 U. S. 333, 343 (1977).

82.     HVA members with VSP insurance coverage have standing to sue in their own right because they have suffered an injury traceable to H.B. 1696 and the State's impending threat of enforcement against VSP.  A "consumer's concern for the free flow of commercial speech often may be far keener than his concern for urgent political dialogue." *Bates v. State*

*Bar of Ariz.*, 433 U.S. 350, 364 (1977).  First amendment speech "protection [is] afforded . . . to the communication, to its source and to its recipients both."  *Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council*, 425 U.S. 748, 756 (1976).   Thus, "freedom of speech necessarily protects the right to receive" information and ideas.  *Id.* at 757 (internal citations and quotations omitted).   Individuals have a First Amendment right to receive truthful information about healthcare pricing and healthcare commercial speech.  *Id.* at 760-71.

83.    The First Amendment is applicable to the State of Texas through the Fourteenth Amendment.

84.    The State cannot meet its burden to show it has a substantial interest in preventing HVA members from receiving truthful information about participating optometrists in the VSP network, discounts and benefits associated with their VSP membership available through specific care providers and retailers, or complete plan information and summaries, including in-network and out-of-network coverage, or any other such information that VSP is chilled in communicating as a result of H.B. 1696.

85.    Not only are HVA members' right to receive truthful information burdened by H.B. 1696, but these members are likely to incur additional expenses or not be able to utilize the full benefits and cost savings to which they are entitled under their VSP plan without receiving this information.  Thus, HVA members would have standing in their own right to assert a First Amendment claim.

86.    A core purpose of HVA and its members associating with the organization is seeing well and being healthy.  Ensuring its members receive truthful and complete speech about their vision insurance benefits and plans, which are obtained through membership with HVA, is an interest germane to HVA's purpose.

87.     Neither the claim nor relief requested requires the participation of individuals members in the lawsuit.  This Court can evaluate the constitutionality of H.B. 1696 without the participation of an HVA member and HVA seeks declaratory and injunctive relief that would run to all members who obtained VSP vision insurance through their HVA membership.

88.     A case or controversy exists because H.B. 1696 creates a genuine, credible, real and immediate threat that Defendants—acting in their official capacities—will seek to enforce H.B. 1696, collect civil penalties for violations of H.B. 1696, or penalize VSP for exercising its Constitutionally-protected rights, resulting in VSP refraining from speaking truthful and complete information about its plans and benefits or otherwise being chilled in the information it communicates to Texans with vision insurance through VSP.  As a result, there is a credible and immediate threat that when H.B. 1696 goes into effect on September 1, 2023, HVA members' right to receive truthful information about their VSP plans and benefits will be unconstitutionally restricted.

89.     HVA seeks a declaration on behalf of its members that provisions TEX. INS. CODE. § 1451.153(4) and § 1451.153(5) are void and unenforceable under the First Amendment of the United States Constitution.

## Count 4: Violation of the First Amendment

### (Bobby Montgomery)

90.     All other paragraphs of this Complaint are realleged and incorporated herein by reference.

91.     Bobby Montgomery individually brings a First and Fourteenth Amendment speech claim.  H.B. 1696 unconstitutionally restrains Mr. Montgomery from receiving truthful health and vision insurance information.

92.     Mr. Montgomery has standing to sue because he has suffered an injury traceable to H.B. 1696 and the State's impending threat of enforcement against VSP.  A "consumer's concern for the free flow of commercial speech often may be far keener than his concern for urgent political dialogue."  *Bates v. State Bar of Ariz.*, 433 U.S. 350, 364 (1977).  First amendment speech "protection [is] afforded . . . to the communication, to its source and to its recipients both."  *Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council*, 425 U.S. 748, 756 (1976).  Thus, "freedom of speech necessarily protects the right to receive" information and ideas.  *Id.* at 757 (internal citations and quotations omitted).  Individuals have a First Amendment right to receive truthful information about healthcare pricing and healthcare commercial speech.  *Id.* at 760-71.

93.     The First Amendment is applicable to the State of Texas through the Fourteenth Amendment.

94.     The State cannot meet its burden to show it has a substantial interest in preventing Mr. Montgomery from receiving truthful information about participating optometrists in the VSP network, discounts and benefits associated with his VSP membership available through specific care providers and retailers, or complete plan information and summaries, including in-network and out-of-network coverage, or any other such information that VSP is chilled in communicating as a result of H.B. 1696.

95.     Not only is Mr. Montgomery's right to hear and receive truthful information burdened by H.B. 1696, but he is likely to incur additional expenses or not be able to utilize the full benefits and cost savings to which he are entitled under his VSP plan without receiving this information.

96.    A case or controversy exists because H.B. 1696 creates a genuine, credible, real and immediate threat that Defendants—acting in their official capacities—will seek to enforce H.B. 1696, collect civil penalties for violations of H.B. 1696, or penalize VSP for exercising its Constitutionally-protected rights, resulting in VSP refraining from speaking truthful and complete information about its plans and benefits or otherwise being chilled in the information it communicates to Texans with vision insurance through VSP.  As a result, there is a credible and immediate threat that when H.B. 1696 goes into effect on September 1, 2023, Mr. Montgomery's right to receive truthful information about his VSP plan and benefits will be unconstitutionally restricted.

97.    Mr. Montgomery seeks a declaration that provisions Tex. Ins. Code. § 1451.153(4) and § 1451.153(5) are void and unenforceable under the First Amendment of the United States Constitution.

### Count 5: Violation of the Fourteenth Amendment

### (HVA on behalf of its members and Bobby Montgomery)

98.    All other paragraphs of this Complaint are realleged and incorporated herein by reference.

99.    HVA also asserts a claim on behalf of its members, as does Mr. Montgomery, under the Equal Protection clause in Section 1 of the Fourteenth Amendment to the United States Constitution.  Under the Fourteenth Amendment, "[n]o state shall . . . deny to any person within its jurisdiction equal protection of the laws."

100.    If a challenged classification is not rationally related to a legitimate governmental purpose, it will not survive an equal protection challenge.  *See Kadrmas v. Dickinson Pub. Sch.*, 487 U.S. 450, 457 (1988).

101.    There is no rational relationship to a legitimate governmental purpose for restricting vision care patients seeking vision care information and benefits and treating them differently under the law in comparison to Texas residents suffering from other health care ailments and disabilities who are able to receive information from their insurers and associations about the lowest-cost and highest-quality providers.  In fact, Texas passed H.B. 711 this same legislative session, which more broadly protects consumers in the general healthcare marketplace's right to receive the exact type of information that is being denied to eye care patients under H.B. 1696.  *See* ¶¶ 61-67.  The State cannot point to anything in the legislative history or record that would constitute a legitimate governmental purpose for treating individuals receiving eyecare differently in terms of the information they can obtain than individuals receiving other forms of healthcare in Texas.  And any conceivable rationale for H.B. 1696, such as protectionist goals for independent optometrists, would exist for other segments of the healthcare industry, so that is no reason for the State to single out individuals seeking vision care and treat them differently under the law.

102.    This is all the more true given the contemporaneous passage of H.B. 711 this session.  The bill analysis for H.B. 711 decries the types of "anti-tiering" and "anti-steering" provisions enacted in H.B. 1696 as "anti-competitive" because they prohibit insurers from providing price or quality information about providers to consumers; eliminating such provisions is meant to reduce the cost of healthcare through more robust provider competition.  House Sel. Comm. Health Care Reform, Bill Analysis, Tex. H.B. 711, 88th Leg., R.S. (2023).  There is no reason the law should treat eyecare patients as less in need of transparency in pricing, access, and quality information about providers or an ecosystem that promotes competition and lowers the cost of care.

103.    As a result, HVA members and Mr. Montgomery are injured by being treated unequally under the law and will be likely to incur costs or the loss of benefits not suffered by other categories of health care insurance recipients in Texas.

104.    HVA incorporates and realleges paragraphs 85-87 regarding its standing to assert a claim on behalf of its members, as ensuring its members have equal protection under the law regarding access to information about their vision insurance benefits is germane to the organization's purpose.

105.    A case or controversy exists because there is a credible and immediate threat that when H.B. 1696 goes into effect on September 1, 2023, HVA members and Mr. Montgomery will be denied equal protection under the law as a result of H.B. 1696.

106.    HVA seeks a declaration on behalf of its members, as does Mr. Montgomery, that provisions TEX. INS. CODE. § 1451.153(4) and § 1451.153(5) are void and unenforceable under the Fourteenth Amendment of the United States Constitution.

## Count 6:  Violation of the Equal Protection Clause of the Fourteenth Amendment
### (VSP and Visionworks)

107.    All other paragraphs of this Complaint are realleged and incorporated herein by reference.

108.    The Equal Protection Clause of the Fourteenth Amendment mandates that all persons similarly situated be treated the same.  When the challenged governmental action affects a fundamental right, the governmental action can only be upheld if it passes strict scrutiny analysis—it must be narrowly tailored to fit a compelling governmental interest.  The First Amendment right to free speech is a fundamental right.

109.    Plaintiffs assert an Equal Protection claim for disparate treatment of vision plan

providers, affiliated optometry retailers, and vision care consumers under H.B. 1696 compared to other similarly situated healthcare and plan providers under H.B. 711.

110.    H.B. 1696 does not further a compelling governmental interest in public health, or any other compelling governmental interest.

111.    Instead, H.B. 1696 will serve only to increase patient costs by deliberately keeping vision care patients underinformed about the most cost-effective options available to them.  This will be detrimental to those seeking vision care, and consequently to the public health.  It also advances the opposite purpose of H.B. 711, which prohibits anti-steering and anti-tiering clauses in health care contracts.  H.B. 1696 instead codifies such clauses against vision care plan providers and vision care patients.

112.    H.B. 1696 serves only the uncompelling goal of protecting independent optometry retailers from competing with the superior integrated business model.  Economic protectionism is not a legitimate, compelling interest.

113.    Moreover, H.B. 1696 is not narrowly tailored.  To the extent that the State is concerned consumers may be misled by a vision care plan provider directing the consumer to an affiliated optometry retailer, that concern could be addressed in a much narrower way—simply requiring disclosure of the affiliation.  Instead of this common-sense approach, the State has passed a law that essentially eviscerates the integrated vision care plan business model.

114.    The effect of H.B. 1696 is to arbitrarily deny VSP and Visionworks the ability to operate according to their existing business model, while allowing—even encouraging—similarly situated insurers to operate in the same manner that has now been outlawed in the vision care industry.

115.    This measure operates at the expense of public health and safety.  H.B. 1696 is not

narrowly tailored to fit a compelling governmental interest.

116. Plaintiffs will suffer substantial and ongoing harm when H.B. 1696 goes into effect, unless and until the discrimination established by H.B. 1696 is declared unlawful and enjoined by this Court.

**Count 7: Violation of 42 U.S.C. § 1983**

**(ALL PLAINTIFFS)**

117. All other paragraphs of this Complaint are realleged and incorporated herein by reference.

118. Unless permanently enjoined by this Court, Defendants will violate Plaintiffs' fundamental rights to freely speak and associate, as well as the right of VSP members, HVA and HVA members, NAVCP members and Mr. Montgomery to receive speech, in violation of the First Amendment, by administering, implementing, and enforcing H.B. 1696.

119. Defendants, acting under color of state law, threaten to deprive Plaintiffs of their constitutionally guaranteed rights to free speech under the First and Fourteenth Amendment of the United States Constitution.

120. When it goes into effect on September 1, 2023, H.B. 1696 will cause disparate treatment between vision care plan providers and other similarly situated health plan providers, by prohibiting the former from fully informing consumers of vision care options under their vision care plans.

121. H.B. 1696 will further effect disparate treatment between vision care consumers and other similarly situated consumers, because consumers seeking vision care will be prohibited from receiving truthful information about participating optometrists in the VSP network, discounts and benefits associated with their VSP membership available through specific care

providers and retailers, or complete plan information and summaries, including in-network and out-of-network coverage, or any other such information that VSP is chilled in communicating as a result of H.B. 1696. Similarly situated consumers seeking other medical care will not be affected in the same way.

122. Defendants, acting under color of state law, threaten to deprive Plaintiffs of their constitutionally guaranteed right to be treated the same as those similarly situated under the Equal Protection Clause of the Fourteenth Amendment of the United States Constitution.

123. A case or controversy exists because H.B. 1696 creates a genuine, credible, real and immediate threat that Defendants—acting in their official capacities—will seek to enforce H.B. 1696, to collect civil penalties for violations of H.B. 1696, or to penalize plaintiffs for exercising their constitutionally protected rights, or chill the right to speak or receive information. In doing so, defendants are acting under color of state law, including TEX. INS. CODE. § 1451.153(4) and § 1451.153(5).

124. Plaintiffs seek both a declaration that enforcement or threatened enforcement of H.B. 1696, TEX. INS. CODE. § 1451.153(4) and § 1451.153(5) by Defendants violates 42 U.S.C. § 1983 and a permanent injunction against its prospective enforcement. Plaintiffs also seek attorney fees pursuant to 42 U.S.C. § 1988.

## PRAYER FOR RELIEF

WHEREFORE, plaintiffs HVA, NAVCP, VSP, Visionworks, Dr. Greg Hogan, and Bobby Montgomery respectfully pray for an injunction and a declaratory judgment, pursuant to TEX. CIV. PRAC. & REM. CODE § 37.001 *et seq.,* and the Declaratory Judgment Act, 28 U.S.C. § 2201, that the challenged provisions of H.B. 1696 violate the First and Fourteenth Amendments of the United States Constitution, and are therefore unenforceable; for actual or

nominal damages, for reasonable attorney's fees pursuant to 42 U.S.C. § 1988, and for any

other and further relief as the Court deems just and proper.

Respectfully submitted,

By:     /s/  Christopher D. Kratovil
**Christopher D. Kratovil**
Texas Bar No. 24027427
ckratovil@dykema.com
**David J. Schenck**
Texas Bar No. 17736870
dschenck@dykema.com
**DYKEMA GOSSETT, PLLC**
1717 Main Street, Suite 4200
Dallas, Texas 75201
Telephone: (214) 462-6400
Facsimile: (214) 462-6401

**ATTORNEYS FOR PLAINTIFF
VISION SERVICES PLAN INSURANCE
COMPANY**

**Gavin R. Villareal**
Texas Bar No. 2408211
gavin.villareal@bakerbotts.com
**BAKER BOTTS L.L.P.**
401 South 1st Street, Suite 1300
Austin, Texas  78704-1296
Telephone: (512) 322-2652
Facsimile: (512) 322-8341

**Aaron M. Streett**
Texas Bar No. 24037561
aaron.streett@bakerbotts.com
**BAKER BOTTS L.L.P.**
910 Louisiana Street
Houston, Texas  77002-4995
Telephone: (713) 229-1855
Facsimile: (713) 229-7855

**ATTORNEYS FOR VISIONWORKS OF
AMERICA, INC., DR. GREG HOGAN,
AND BOBBY MONTGOMERY**

**Errol J. King, Jr.**
Louisiana Bar No. 17649 (pro hac vice application forthcoming)
errol.king@phelps.com
**PHELPS DUNBAR LLP**
II City Plaza
400 Convention Street, Suite 1100
Baton Rouge, LA 70802
Telephone: (225) 376-0207
Facsimile: (225) 381-9197

**Blake A. Bailey**
Texas Bar No. 01514700
blake.bailey@phelps.com
**PHELPS DUNBAR LLP**
2102 E. State Highway 114, Suite 207
Southlake, Texas 76092
Telephone: (817) 305-0332
Facsimile: (817) 488-3214

**ATTORNEYS FOR NATIONAL ASSOCIATION OF VISION CARE PLANS, INC.**

**John W. Petrelli**
Texas Bar No. 24056126
John.petrelli@morganlewis.com
**Greg Etzel**
Texas Bar No. 00793705
Greg.Etzel@morganlewis.com
(application for Northern District of Texas admission pending)
**Catherine L. Eschbach**
Texas Bar No. 24097665
catherine.eschbach@morganlewis.com
(application for Northern District of Texas admission pending)
**MORGAN, LEWIS & BOCKIUS LLP**
1000 Louisiana Street, Suite 4000
Houston, Texas  77002-5006
Telephone: (713) 890-5474
Facsimile: (713) 890-5001

**ATTORNEYS FOR HEALTHY VISION ASSOCIATION**